UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

COLUMBUS MCKINNON CORPORATION

                                  Plaintiff,

     - vs -                                 Case No.: 08-CV-167

SST CASTINGS, INC. a/k/a SST CORPORATION, INC., and
SST BEARING CORPORATION,

                                  Defendants.

## COMPLAINT FOR DECLARATORY JUDGMENT

Columbus McKinnon Corporation ("Columbus McKinnon" or "CM"), by its counsel, Nixon Peabody LLP, for its Complaint against defendants SST Castings, Inc. (a/k/a SST Corporation, Inc.)("SST Castings") and SST Bearing Corporation ("SST Bearing")(collectively referred to as "SST"), alleges as follows:

## NATURE OF THE CASE

1. This action is for a declaratory judgment pursuant to 28 U.S.C. § 2201 for the purposes of resolving an actual controversy between the parties and construing and declaring their rights and legal obligations arising from certain Supplier Agreements.

2. Columbus McKinnon seeks a declaration that (1) the Supplier Agreements did not and do not obligate it to purchase any particular volume or number of products; (2) the Supplier Agreements did not and do not designate SST as an exclusive supplier; (3) SST was and is required to submit proper periodic reports, conforming samples, and testing/engineering and other documentation for each part as conditions precedent to any purchase orders being issued by CM; and (4) CM is not obligated to pay for products that SST decided to unilaterally manufacture or procure and release, and which CM never ordered or accepted.

10915863.1

-2-

## THE PARTIES

3. Plaintiff Columbus McKinnon is a corporation organized under the laws of the State of New York and is headquartered in Amherst, New York. It has operating divisions and facilities located across the country. Columbus McKinnon provides various solutions to the material-handling industry and has product lines that include kiln chains, anchor chains, chain and wire-rope hoists, robotic material-handling equipment, medical products, powered-roller conveyors, and tire-shredding equipment for recycling purposes.

4. Defendants SST Castings and SST Bearing are entities that are both headquartered at 154 Commerce Blvd., Loveland, Ohio 45140.

## JURISDICTION AND VENUE

5. Pursuant to 28 U.S.C. § 1332, the Court has jurisdiction over the subject matter of this action because there is complete diversity of citizenship between the parties and the matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars ($75,000.00).

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the controversy occurred in this judicial district.

7. This Court has personal jurisdiction over SST because, upon information and belief: (i) SST has constitutionally sufficient contacts with New York as to make personal jurisdiction proper in this Court because SST conducts business in New York and derives revenue from sales of products in New York; and (ii) SST purposely availed itself of the benefits and laws of New York by appearing in this District and taking part in contract negotiations and business transactions with CM.

1191586

- 3 -

## FACTUAL ALLEGATIONS

8.  In early March 2001, the parties entered into a "Strategic Supplier Agreement" ("2001 Agreement") whereby SST Castings agreed to become "a" supplier of various iron-casting products ordered by CM. The term of the 2001 Agreement was from March 1, 2001 through February 29, 2004. The Agreement could have been extended for one year "upon the written mutual consent" of the parties. However, the parties did not do so.

9.  Attached to the 2001 Agreement is "Schedule I," which lists 39 different parts and part numbers, cost information, brief descriptions, and references to certain CM divisions/plants to which the parts ordered by CM would be shipped. A copy of the 2001 Agreement is attached as **Exhibit A**.

10. Also referenced in Schedule I were CM's estimated annual usages for each of the 39 parts – essentially a non-binding projection of the number of units that CM might purchase for each part in a given year.

11. The 2001 Agreement specifically provides that the estimated item usages could change depending on a host of economic, market, and other factors. SST specifically acknowledged that any part or all of its iron casting business from CM might fluctuate and that the annual-usage estimations were not set in stone. Paragraph 6 of the Agreement states:

> **Business Fluctuations:** SST acknowledges that, while CM expects its overall business will grow, the ultimate amount of iron casting business received by SST from CM is subject to market conditions. Additionally, CM's individual item volumes may change as a result of economic and market conditions, product rationalization, and value engineering initiatives, etc.

12. Paragraph 9 of the Agreement provides that there were no minimums (quantity of parts or dollar values) tied to any of CM's purchase orders: "CM will not be subject to any set up charges, minimum order quantities, or minimum purchase order dollar values per purchase

- 4 -

order."

13. Paragraph 17 of the 2001 Agreement provides that "SST will provide a periodic (generally – monthly) project management status report to CM's Commodity Manager until all items or part numbers in Schedule I have been implemented." The provisions of this paragraph clearly demonstrate that – as conditions precedent to purchase by CM – SST was required, for each and every part, to provide the periodic reports, to submit conforming sample parts and documentation for "CM testing and engineering approval," and to perform "corrective action on tooling and samples." *See* Ex. A, ¶ 17.

14. In or about July 2002, CM and SST Bearing entered into a separate Strategic Supplier Agreement ("2002 Agreement") whereby SST Bearing agreed to become "a" supplier of various bearings products ordered by CM. The term of the 2002 Agreement was from June 1, 2002 through May 31, 2005.

15. Attached to the 2002 Agreement is a Schedule that lists 36 different parts and, among other things, part numbers, cost information, general part descriptions, and references to the CM divisions and plants to which the parts ordered by CM would be shipped. A copy of the 2002 Agreement is attached as **Exhibit B**.

16. Like the 2001 Agreement, the Schedule to the 2002 Agreement listed estimated annual usage volumes that CM might purchase for each of the 36 parts in a given year.

17. Like the 2001 Agreement, the 2002 Agreement specifically provides that the estimated item usages may fluctuate depending on economic, market, or other factors: "[T]he ultimate amount of bearing business received by SST from CM is subject to market conditions. Additionally, CM's individual item volumes may change as a result of economic and market conditions, product rationalization, and value engineering initiatives, etc." *See* Ex. B, ¶ 6.

- 5 -

18. The 2002 Agreement also provides that there were no minimums (quantity of parts or dollar values) tied to CM's purchase orders.

19. Paragraph 16 of the 2002 Agreement provides that "SST will provide a periodic (generally – monthly) project management status report to CM's Commodity Manager until all items or part numbers in Schedule I have been implemented." The provisions of this paragraph expressly provide that – as conditions precedent to purchase by CM – SST was required, for each and every part, to provide the periodic reports, to submit "sample parts and required documentation for CM testing and engineering approval," and to perform "corrective action" as required by CM. *See* Ex. B, ¶ 16.

20. In April 2006, CM and SST Bearing entered into a separate Supplier Agreement ("2006 Agreement") whereby SST Bearing again agreed to become "a" supplier of various bearings products ordered by CM. The term of the 2006 Agreement is from April 1, 2006 through September 30, 2008.

21. Attached to the 2006 Agreement is another Schedule that lists 39 different parts (including some that were listed in the 2002 Agreement) and, among other things, part numbers, cost information, general part descriptions, and references to the CM divisions and plants to which the parts ordered by CM would be shipped. A copy of the 2006 Agreement is attached as **Exhibit C**.

22. Like the 2001 and 2002 Agreements, the Schedule to the 2006 Agreement lists estimated annual volumes that CM could purchase for each of the 39 parts.

23. Like the 2001 and 2002 Agreements, the 2006 Agreement specifically provides that the estimated item usages may fluctuate depending on economic, market, or other factors: "[T]the ultimate amount of bearing business received by SST from CM is subject to market

- 6 -

conditions. Additionally, CM's individual item volumes may change as a result of economic and market conditions, product rationalization, and value engineering initiatives, etc." *See* Ex. C, ¶ 6.

24. The 2006 Agreement also provides that there were no minimums (quantity of parts or dollar values) tied to CM's purchase orders.

25. Paragraph 16 of the 2006 Agreement provides that "SST will provide a periodic (generally – monthly) project management status report to CM's Commodity Manager until all items or part numbers in Schedule I have been implemented." The provisions of this paragraph expressly provide that – as conditions precedent to purchase by CM – SST was required, for each and every part, to provide the periodic reports, to submit "sample parts and required documentation for CM testing and engineering approval," and to perform "corrective action" as required by CM. *See* Ex. C, ¶ 16.

26. The Agreements do not provide that SST was to be CM's exclusive supplier for any of the subject parts. In fact, each of the Agreements refer to SST as "a" supplier and contemplate that, as a strategic supplier, SST was to take part in certain development, engineering, cost-savings, and other programs implemented for CM's suppliers.

## COUNT I – DECLARATORY JUDGMENT

27. CM incorporates paragraphs 1 through 26 as if fully stated herein.

28. Despite the express provisions of the Agreements – which provide that "CM's individual item volume may change" and that SST was to satisfy certain conditions precedent to purchase by CM – and despite the fact that SST is not an exclusive supplier of any of the subject parts, SST claims that CM is in breach of the agreements by its alleged failure to reach the annual usage levels for a select few number of parts under the Agreements, and from CM's alleged failure to order and accept a select few parts that SST unilaterally manufactured or

1091526

- 7 -

procured and decided to release to CM. On January 30, 2008, CM received a "Position Statement" from SST's counsel. A copy of the letter is attached as **Exhibit D**.

29. Essentially, with respect to a relatively-small number of parts (compared to the number of parts listed in the Agreements), SST claims that CM owes it for products that SST unilaterally decided to release and ship, for other parts that it has in stock that CM has not ordered or released, and for lost profits relating to a select few types of products that were not purchased to the level of the annual usage estimations.

30. With respect to the 2006 Agreement, SST claims that it will be entitled to $400,000 in lost sales if CM does not purchase a certain number of parts by the expiration of the Agreement term – September 30, 2008.

31. SST acknowledges that the vast majority of parts that CM purchased were consistent with the estimated annual usages. Despite this, SST claims that CM acted in bad faith with respect to the few select parts that fell short of the estimated usages, and in so doing, SST maintains that CM had an unwavering obligation to purchase a set number of the subject parts exclusively from SST.

32. SST makes clear that the rights and obligations of the parties under the Agreements are in controversy, and that there are significant uncertainties regarding the parties' obligations going forward – for example, among other things, uncertainties with respect to the parties' rights under the 2006 Agreement that has not expired yet; uncertainties with respect to many other "valuable transactions still occurring" between the parties that will be affected by finalization of the controversies at bar; uncertainties regarding parts that CM has not ordered but that SST has apparently stock-piled and plans to unilaterally release and charge to CM; and uncertainties about SST's reporting, sampling, documentation, testing and other obligations

- 8 -

under the Agreements.

33. CM contends that it acted in good faith at all times; that it has no obligation to pay for parts that it did not order or accept; that SST failed to follow the Project Management requirements and other conditions precedent for certain parts; that CM was and is free under the subject Agreements to purchase the subject parts from competitive suppliers; and that CM had no obligation to purchase any particular number or volume of parts.

34. SST's position ignores the clear and unambiguous language of the Agreements, and creates an actual controversy as to the parties' rights and obligations – past, present, and future.

35. CM is therefore entitled to a declaration that (1) the subject Agreements do not obligate CM to purchase any particular number or volume of any particular product; (2) the subject Agreements do not designate SST as an exclusive supplier of any of the subject parts; (3) SST was required to submit proper periodic reports, conforming samples, and testing/engineering and other documentation for each part as conditions precedent to any purchase orders being issued by CM for the subject parts; and (4) CM is not obligated to pay for products that it never ordered or accepted and that SST chose to unilaterally manufacture or procure and release.

**WHEREFORE**, Columbus McKinnon respectfully requests

1. That the Court, in exercising its discretion, enter a declaratory judgment that Columbus McKinnon was not and is not obligated under the Agreements to purchase any particular number or volume of any particular products from SST, and that therefore, Columbus McKinnon is not obligated to pay any lost profits to SST in connection with its claims relating to volume sales;

1091586

2. Declaring that the subject Agreements did not provide SST with any exclusive supplier rights, and, therefore, Columbus McKinnon is not liable to SST for purchasing any parts from competitive suppliers;

3. Declaring that the subject Agreements obligated SST to submit proper periodic reports, conforming samples, and testing/engineering and other documentation for each part as conditions precedent to any purchase orders being issued by Columbus McKinnon, and, therefore, Columbus McKinnon is not liable to SST for purchasing any such parts from competitive suppliers or for any alleged lost profits claimed by SST for such products.

4. Declaring that Columbus McKinnon is not obligated to pay for products that SST decided to unilaterally manufacture or procure and release and which Columbus McKinnon never ordered or accepted; and

5. That Columbus McKinnon be awarded such other and further relief as the Court deems just and proper.

Dated: February 26, 2008

NIXON PEABODY LLP

By: /s/ Susan C. Roney
Susan C. Roney
*Attorneys for Columbus McKinnon*
40 Fountain Plaza, Suite 500
Buffalo, NY 14202
Tel: (716) 853-8100
E-mail: sroney@nixonpeabody.com

1091586